## SARAH E. CARTER et al.

### v.

### JOHN BURR et al.

Where trustees make investments in securities which they are obliged to sell within two years, and which one of them, in the absence of the other, at a judicial sale, buys for his son at about two-thirds of the amount of the investment, the son having just reached his majority, and being in his father's employ at a small compensation, and not present at the sale nor in anywise consulted; and the father admitting the property sold to be worth at least $300 more than his bid, and retaining the possession of the deed and of the property, and managing it all for his own protection, and continuing to pay interest on the origi--

Carter *v.* Burr. · ·

nal sum so invested for several years, such sale will not be upheld, but the property will be decreed to be liable for the whole amount due upon such investment, and another sale of the premises ordered.

*Mr. S. C. Bergen,* for the complainants.

*Mr. P. S. Scovel,* for the defendants.

BIRD, V. C.

Sarah E. Carter is a widow and the executrix of Henry Carter, who died in 1879; John Carter is her son; John Burr is executor of the will of Henry Carter; John D. Burr is his son. Mrs. Carter is entitled to the interest, rents and profits of her husband's estate until her son arrives at the age of twenty-one years, when he is entitled to $2,000 of the principal, and she is entitled to the interest, rents and profits of the balance during her life, and, at her death, John is entitled to the principal. She, as executrix, and John Burr, as executor, proved the will, and took charge of the estate, the business thereof being principally attended to by John Burr until the settlement in 1873. In this she joined in making. In July, 1877, having $2,500 to invest, they purchased a bond and mortgage given by Jesse W. Starr upon a drug-store and dwelling-house in Camden, taking the assignment of said bond and mortgage from a previous assignee. During the very next year, the interest being unpaid, they foreclosed the mortgage, and by virtue of execution issued on the decree in that cause, the property was advertised for sale. John Burr attended the sale; Mrs. Carter did not. There were no bidders, and the sale was adjourned. John Burr appeared, and Mrs. Carter did not.

There seems to have been a misunderstanding between them as to what he was to do upon that occasion. Mrs. Carter says that she told Mr. Burr that he must protect the interest of the estate. It is of little consequence, however, what either understood from the other with respect to their duties. Since he attended the sale, however, it was manifestly his duty to protect the interest of the estate. The property was offered for sale, and was bid up to $1,600, by strangers, when, no one else bidding, John Burr

bid $1,700, and the property was struck off to him; but he says that he bought it for his son, John D. Burr, and that he signed the condition of sale for his son by signing his own name, John Burr per John D. Burr.

Mrs. Carter and her son charge that this transaction was only colorable, and that John Burr purchased for himself, and really intended by the transaction to secure the estate the amount due upon the mortgage. The bill aims at charging John Burr with the amount of the mortgage and all interest which is due thereon. And the counsel also directly insists that the bill is broad enough in its scope to hold that the title of said property is, in equity, in said John Burr, and not in John D. Burr, and that the purchase was made for himself, although he took the title in the name of his son. I am disposed to regard the bill as sufficient for both purposes.

It is to be considered, therefore, whether the facts of the case warrant both or either of the propositions presented by the bill.

In the first place, it is to be observed that this property which was taken to secure the sum of $2,500, in July, 1877, was sold on a foreclosure of the mortgage, in a little more than a year, for $1,700. It is also to be observed that John Burr was a business man and well acquainted with the value of real estate in Camden. This being the fact, were the charge directly made that he was liable for the whole amount of said loan, because of gross negligence in making the investment, it would be very difficult for him to successfully resist the charge. He may have been conscious of this fact; and it may be that this self-consciousness will aid us in coming to an understanding of what passed afterwards between him and Mrs. Carter. For, in his dealings with her respecting this matter, some things were said and done which might have led her, she being a plain woman and unacquainted with business, to believe that the whole $2,500 was still secured by mortgage.

Mr. Burr himself says, that the property was worth at least $2,000 at the time he made the bid of $1,700. The court cannot close its eyes to this important admission. If it was worth at least $2,000, how much more was it reasonably worth? Was

it not worth the whole $2,500? In his estimation it was worth that a little more than a year before. The talk of great depreciation at that time will not satisfy the great gap that this trustee seeks to establish to have intervened in that very short period of time.

After the property was thus struck off and the title secured in the name of his son, John D. Burr, this executor carried to Mrs. Carter three papers, two of them being assignments of the said bond and mortgage and one a policy of insurance. These she held until a short time prior to the commencement of this suit. John Burr paid her the interest until July, 1883, about five years from the time of the purchase of the property by him for his son at the sheriff's sale, on the whole $2,500.

About this time, some question arising respecting Burr's liability, Mrs. Carter took counsel, and was informed that the papers which she held, and which she says she supposed were evidence of his liability, were wholly worthless. He was then appealed to by and on behalf of Mrs. Carter, when he denied all liability for anything above $1,700. He insisted that that was the price at which the lot was sold to his son, and that he, as executor, received that amount and is liable to account for that amount, less the costs and expenses of foreclosure, which were $175. It is urged, in his behalf, that the transaction was honest and fair in all respects, and that the son ought to be permitted to hold the property and the executor only be required to account for the $1,700. It appears, as I have said already, that, on the day first named by the sheriff in his advertisement for the sale of these lands, there were no bidders present, so that the sale was adjourned for one week, at which time there were no two persons present who bid upon the property until the last bid of $1,600 was made, when, no one bidding again, John Burr, the executor, bid the $1,700.

As I understand the testimony, at this time John D. Burr, the son, was about twenty-one years of age, and was in his father's employ at a very small compensation. He had no means of his own with which to make such purchase. It does not appear that he had any desire or intention of purchasing this parcel of

land or any other. He not only had nothing to do with fixing the price, nor did he have any knowledge of what was to be done in his behalf. Nor has he ever said or done anything which indicates an assertion of dominion or ownership.

The father, who was also executor, and was present giving directions at the sale, acted in every particular according to his own will, judgment or interest. He says that his mother-in-law directed him to make the purchase, and that he had $4,000 of her money in his hands with which to do it; but yet, according to his own statement, he never kept any account or had any settlement or any further understanding with his mother-in-law concerning it. He had the deed recorded and took charge of it and has kept it in his own possession ever since, claiming that he holds it for his own protection. In speaking of the great reduction in price below the amount of the mortgage, he says that he discovered that the property was greatly dilapidated and needed large expenditures to put it in repair, which, if true, must have been so to a very large extent at the time of the investment, only a little more than a year before. He proceeded at once to make repairs and additions, at a cost of over $2,500. As intimated above, in all this outlay and change of the character of the buildings, the son had neither hand nor voice; but the father held the deed for his own protection. Though it be true that the son was not consulted with respect to improvements or expenditures, yet, the father says that he and his son always had a good understanding. I think these facts suggest one great reason why the executor continued to pay the interest on $2,500— he was conscious of his liability.

He says, however, that he paid this interest at the instance of Jesse W. Starr, Jr., the mortgagor, who, though then a bankrupt, assured him that if he would so pay the interest on the whole claim, he would not only re-imburse him, but would pay to the estate the whole deficiency of the principal. And he continued so to pay until Mrs. Carter insisted upon his liability being more definitely fixed.

Mrs. Carter says that she all the time understood that John Burr's liability for the $2,500 was fixed by a mortgage on this

property.   She declares that when he handed her the two assignments referred to and the policy of insurance that he spoke of them as the bond and mortgage.   This he denies, and says that he told her what they were and that the assignments were worthless.   But without weighing the probabilities in connection with this branch of the case, over which a great deal of time has been spent, the conviction which seems to have rested upon the mind of Mrs. Carter had a strong foundation in the numerous receipts drawn by Burr, which he required her to sign upon the payment to her of the interest.

He thus paid the interest until February 7th, 1881, in different small sums, and on that. date he took from Mrs. Carter a receipt in these words : " Rec'd Camden February 7th 1881, of Mr. J. Burr the sum of one hundred dollars in full for interest due on bond and mortgage 16th January 1881." This was signed by Sarah Carter.   In August of that year he took similar receipt from her.   He took another of the same purport in March, 1883, and also in July, 1883, and one in February, 1884, and also in August of that same year to the same effect.

These show the foundation for the observation, that he acted as though he was conscious of his liability ; and they show a very broad foundation for the conviction which controlled Mrs. Carter.

I cannot escape the conviction, that it would be the height of injustice to allow Mr. Burr, the executor, or his son to pocket the value of the property over and above the $1,700.   Mr. Burr says at the time of the sale it was worth at least $300 more. Considering his whole conduct in connection with what he admits the property to have been worth, I can have no doubt but that he intended to account to the estate for the whole amount due upon the bond and mortgage.   But whether he did so intend or not, what he did afterwards in accounting with Mrs. Carter for the interest, thereby closing her eyes against all investigation, together with the very suspicious manner in which the sale was made, makes it quite clear, to my mind, that there is no way of satisfying the demands of equity except by charging the whole amount against said lands and declaring the same to be a lien

thereon, and directing a sale thereof to raise and satisfy the whole amount due.

It might amply suffice for authority to support these views and show the right of the *cestui que trust* to ask for a re-sale, and the duty of the court to order it, to cite the case of *Marshall* v. *Carson, 11 Stew. Eq. 250;* but that being a case in which the trustees purchased in their own behalf, I call attention to the case of *Davone* v. *Fanning, 2 Johns. Ch. 252,* which is especially applicable, since the trustee in that case, who was executor and authorized to sell, purchased the property in the name of and for his wife. In that case the court declared the trust to be a continuing one, and ordered a re-sale. See *Davone* v. *Fanning, 2 Johns. Ch. 257, 261.*

Both principle and authority direct me to advise a sale.